UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA S., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 C 4736 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| FRANK BISIGNANO, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Samantha S. seeks to reverse the final decision of the Commissioner of the
Social Security Administration (the "Commissioner") denying her application for disability
insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.
Because the Administrative Law Judge ("ALJ") erred when evaluating the medical opinions
from two state psychological consultants and Samantha S.'s neurosurgeon, the Court reverses the
ALJ's decision and remands this case for further proceedings consistent with this Opinion.

## BACKGROUND

### I.      Medical History

#### A.      Cervical Spine

Samantha S.'s ex-boyfriend assaulted her and fractured her neck, resulting in her needing
to undergo an anterior cervical discectomy and fusion surgery in 2017, which neurosurgeon Dr.
Schaible performed.  AR 420, 1005, 1330.  Following this surgery, Samantha S. frequently
reported sharp, severe neck pain and left upper extremity numbness and weakness.  *Id.*; *see also*
AR 454, 495, 1001–02, 1223.  Her primary care physician, Dr. Tom Kim, advised her to have a
computed tomography ("CT") examination of her cervical spine and to follow up with a

neurosurgeon. AR 454. She also attended nine physical therapy appointments, with the last appointment taking place on January 15, 2021. AR 2635–88.

Samantha S. subsequently underwent multiple procedures examining her cervical spine in late June and early July 2020. First, a magnetic resonance imaging ("MRI") procedure noted a chronic, healed right C6 fracture, effacement of the thecal sac, and likely myelomalacia and edema. AR 593. Dr. Itkin, the neurologist interpreting the MRI results, explained that he was "worried" because there was "significant epidural cord compression . . . that needs to be surgically looked at." AR 1330. Additionally, a July 6, 2020 x-ray found anterolisthesis, retrolisthesis, and advanced discogenic disease at C6–C7. AR 588–89. Samantha S. also underwent a CT scan, which found "[l]oosening of the C7 anterior fixation screws" and "multilevel degenerative changes." AR 557. At the same time, Samantha S.'s surgeon, Dr. Schaible, also noted that Samantha S. still had "a nonunion" and "cord compression secondary to hypertrophic changes in the posterior elements." AR 419.

Due to these issues, Samantha S. received a second cervical spine surgery, again performed by Dr. Schaible, on July 6, 2020. *Id.* This surgery involved a "[d]ecompressive cervical laminectomy C4 to T1, with posterior segmental instrumentation C2 to T2, with local harvested bone, segmental instrumentation and navigation." *Id.* Samantha S.'s surgical wound became infected after her second surgery, and she was hospitalized from July 31 through August 4, 2020 as a result. AR 374. During this hospitalization, Dr. Schaible performed another surgery in which he incised and irrigated Samantha S.'s wound. AR 383. After leaving the hospital, Samantha S. had follow up appointments with Dr. Kim on August 7 and August 20, 2020. Samantha S. reported that she was still very sore and had severe pain. AR 375, 401. Dr. Kim

provided Samantha S. with a refill of her pain medication and advised her that she may need another surgery in the "distant future." AR 404.

Shortly thereafter, however, Samantha S.'s cervical implant failed and imaging showed loose hardware. AR 1602. She was admitted to the hospital "for revision of hardware with anterior and posterior cervical fusion" on October 2, 2020, at which point she was still "experiencing significant pain." *Id.* After this revision, Dr. Kim noted that Samantha S. "improved and was discharged [on October 9, 2020] in good condition." AR 1606. On November 19, 2020, Samantha S. stated in a follow up with Dr. Kim that her neck was "okay" and her pain was "controlled," although she had "only 50% range of motion." AR 1871. Similarly, Dr. Schaible noted after a December 2, 2020 appointment that Samantha S.'s neck was "doing well" and that she "seem[ed] to be making progress." AR 1898.

Three months later, on February 8, 2021, Samantha S. had another follow up appointment with Dr. Kim and again reported experiencing "severe pain in [her] back and neck," along with "numbness and tingling in [her] arms." AR 1844. She continued complaining of pain, numbness, and discomfort in appointments with Dr. Schaible in June and July 2021, although Dr. Schaible noted that she appeared stable and that he did not believe she would need an additional surgery. AR 2298–2300.

In June 2021, however, an MRI and CT scan of Samantha S.'s cervical spine found that "[s]everal of the upper cervical posterior screws appear[ed] to be backed out with only the tips of the screws within the bone." AR 316. Dr. Kim subsequently referred Samantha S. for an electromyography and nerve conduction study, completed on July 8, 2021. AR 310. She again reported a "painful sensation" in her right forearm and numbness in her left hand, which had been present for over a year. The physician conducting the tests, Dr. Roy L. Adair, found an

3

"[a]bnormal electrophysiologic examination of both upper extremities." AR 312. These findings were "consistent with chronic mild to moderate axonal loss in the distribution of C7," which "could be an intraspinal lesion or root lesion." *Id.* Upon review of these testing results, neurosurgeon Dr. Ricardo Fontes, MD, Ph.D, recommended specialized pain management and conservative treatment "prior to considering complex revision surgery for realignment and fusion." AR 2588. His notes report that he "had a very candid discussion with" Samantha S. to discuss the "very real risks of serious problems" that could result from additional surgeries and informed her that "she should only have it if absolutely miserable and unwilling to continue to live like this." AR 2595.

Samantha S. had further appointments with Dr. Kim in September 2021 for pain management, and she reported worsening symptoms, decline in hand dexterity, and fatigue. AR 2401, 2405. She further reported that she could not sleep due to the pain she was experiencing. *Id.* During the appointment, Dr. Kim discussed with Samantha S. the possibility of additional surgery, explaining that it would be "longer" and would have the "possibility of risks and complications," as well as a "significant rehabilitation period." AR 2401.

Starting in December 2021, Samantha S. also began reporting worsening incontinence of both urine and stool, along with paresthesia from the knees down. AR 2318. Dr. John O'Toole, a neurosurgeon treating Samantha S., informed her that it was unclear whether these symptoms were related to her spinal cord lesion and "had a long conversation with [her] regarding the pros and cons of surgical intervention." AR 2319. She again reported these symptoms in March 2022, and Dr. O'Toole referred her for a urology evaluation. AR 2598, 3341.

Samantha S. had another appointment with Dr. Kim in March 2022. She again reported pain in her back, and diagnostics revealed an enlargement of her spinal cord between T2 and

T11. AR 2366. Subsequently, Dr. Fontes again evaluated her condition, noting that she reported continuing neck, shoulder, and back pain and worsening bilateral hand function. AR 3354. He explained to Samantha S. that she had "severe myelomalacia at more than [one] place in the cervical cord and that neurological improvement should not be expected with any additional surgical intervention. AR 3358. He further noted that she had "multiple causes for neck pain and that complete improvement will not happen, and even a modest approvement can only be expected ~50% of the time." *Id.* He nonetheless "offered her a T2 PSO, revision fusion C2-T9," but he cautioned her again about the significant risks of each surgery and that "she should only have it if absolutely miserable and unwilling to continue to live like this." AR 3358–59; *see also* AR 4565–67 ("I explained her deformity is very complex and surgery carries an elevated risk of mortality and morbidity."). Despite these risks, Samantha S. decided to proceed with the surgery and scheduled it for July 5, 2022. AR 3359.

The surgery proceeded as scheduled. AR 3812. Later that month, on July 26, 2022, Samantha S. went to Rush Hospital after experiencing wound dehiscence, expressible drainage, and pain after her surgery. AR 9, 15. There, she had another surgery on her spine, described in medical records as a "washout, and extension of prior fusion to L2." AR 9, 13–14. Afterwards, Samantha S. was admitted to the intensive care unit until her medical providers deemed her safe for discharge on August 5, 2022. AR 9. After being discharged, however, cultures from the washout grew staph aureus and enterobacter, requiring Samantha S. to begin taking various types of antibiotics. AR 3685. An attending physician in the infectious diseases division, Dr. Andy Simms, noted that Samantha S. did not want another surgery and therefore would likely need to continue taking bactrim indefinitely for chronic oral suppression. AR 3689.

5

In November 2022, Samantha S. still reported "significant back pain" and claimed that this pain limited her activity. AR 3769. Approximately a year after her most recent surgery, Samantha S. had another appointment with Dr. Fontes. Although she reported "doing better from the pain standpoint," she continued to have "a baseline amount of chronic pain and myelopathic signs." AR 3699. She reported similar symptoms to Dr. Simms. AR 4738 ("She feels uncomfortable due to chronic lower back pain. She continues to have pain and limited range of motion of neck.").

In late 2023, Samantha S. was still experiencing "burning pain in her right shoulder" and "numbness/tingling" in her arms and hands. AR 4628–35. For this reason, she received trigger point injections from Dr. Travis Schaefer on December 29, 2023. AR 4631. However, in January 2023, Samantha S. returned for a follow up visit with Dr. Simms and reported that she had been "feeling terrible lately due to severe back pain for the last 1.5 weeks which is worse at night." AR 4659. Samantha S. further informed Dr. Simms that she had been experiencing increased incontinence. *Id.* Dr. Simms ordered lab work and suggested that she follow up with Dr. Fontes.

On March 18, 2024, Dr. Fontes noted that Samantha S. was "[o]verall doing well" and "very happy with her current alignment." AR 5718. At the same time, he noted that she was still experiencing continued "chronic neck and back pain" and weakness. *Id.* She also reported significant weight loss due to frequent diarrhea, as well as continued occasional incontinence. *Id.* Dr. Fontes concluded that her current condition was the "best clinical scenario" and unlikely to improve in the future. *Id.*

### B.     Mental Health

Samantha S. has multiple diagnoses related to her mental health, including generalized anxiety disorder, bipolar disorder, and post-traumatic stress disorder ("PTSD").  *See* AR 368.  In 2019 and 2020, she had multiple appointments with psychiatrist Dr. Harcharan Sandhu, MD, to help her manage these diagnoses.  Initially, in January 2019, she reported that she was "doing fair" but had increased anxiety symptoms.  AR 368.  She continued improving, reporting to Dr. Sandhu in April 2019, July 2019, January 2020, and April 2020 that her anxiety symptoms were improving and that she was coping better.  AR 362, 364, 366.

This improvement stalled after she had her July 2020 spinal surgery.  At an appointment on July 20, 2020, Samantha S. reported that she was in a lot of pain and experiencing increased anxiety.  AR 358.  Dr. Sandhu noted that her speech was slow and monotone and that her mood was "mildly depressed," but that she nonetheless maintained a logical thought process and good focus and concentration.  *Id.*  The same was true on October 9, 2021, at which point Samantha S. again reported increased anxiety symptoms and stressors, as well as a "lot of pain."  AR 1835.  The next month Samantha S. reported that she was doing "so so" but still experiencing increased anxiety and depression.  AR 1833.  And in January 2021, Samantha S. again reiterated that her anxiety was worsening.  AR 1831.  Dr. Sandhu recommended that she begin attending therapy and continue to follow up with her primary care physician.  AR 1831.

Samantha S. continued reporting "increased anxiety and depression" through March 2022, although Dr. Sandhu noted that she demonstrated logical thought process and good judgment and concentration.  AR 2349.  Samantha S. also reported that she wanted to see a therapist to manage her PTSD, AR 2355, but it is not clear from the records if she began attending therapy.  She improved in December 2022, reporting that she had received another

7

surgery and had her pain under control. AR 3434. On July 24, 2023 and October 26, 2023, however, Samantha S. reported to Dr. Sandhu that she could not leave the house due to her anxiety. AR 2592, 3432. Despite this, she described herself as doing "fairly well." AR 3592.

## II. Procedural History

Samantha S. applied for DIB benefits on June 29, 2020, alleging that she could not work as of June 27, 2020. AR 104. The Social Security Administration ("SSA") denied her application at both the initial and reconsideration stages of review in 2021. AR 137, 144. Samantha S., represented by counsel, subsequently requested a hearing in front of an ALJ. AR 60, 154. The ALJ held the hearing on April 19, 2022, during which Samantha S. and a vocational expert, Sara Gibson, testified. AR 60–102. On May 31, 2022, the ALJ issued a written decision finding that Samantha S. was not disabled within the meaning of the Social Security Act during the relevant time period. AR 25–53. Samantha S. appealed the ALJ's decision to the Appeals Council, which denied review on January 19, 2023. AR 1–7. This caused the ALJ's decision to become the final decision of the Commissioner. *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) ("Because the Appeals Council denied review of [claimant's] application, the ALJ's decision became the final decision of the Secretary[.]"); 20 C.F.R. § 404.981.

On May 20, 2023, Samantha S. appealed to the Northern District of Illinois. The parties filed an agreed motion for reversal with remand, and Judge Fuentes remanded the case pursuant to 42 U.S.C. § 405(g). *Samantha S. v. Kijakazi*, No. 23 C 1734, Doc. 18 at 1 (N.D. Ill. August 14, 2023). As a result, the Appeals Council vacated the final decision of the Commissioner and remanded the case to the ALJ to give further consideration to the medical source opinions and prior administrative medical findings. AR 2816–18. The Appeals Council also directed the ALJ

to obtain supplemental evidence from a vocational expert "to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy." AR 2817.

Following the court's remand, the ALJ held another hearing on April 9, 2024. On May 29, 2024, the ALJ issued a second written decision finding that Samantha S. was not disabled within the meaning of the Social Security Act during the relevant time period. AR 2699–2714. Samantha S. appealed this new decision to the Appeals Council, which again denied review on February 25, 2025, causing the ALJ's 2024 decision to become the final decision of the Commissioner. AR 2689–95.

### III. The ALJ's May 29, 2024 Decision

Following the five-step analysis used by the SSA to evaluate disability, the ALJ found at step one that Samantha S. had not engaged in substantial gainful activity since June 27, 2020, the alleged onset date. AR 2701–02. The ALJ then proceeded to step two, finding that Samantha S. suffered from the following severe impairments: degenerative disc disease of the cervical spine, status post-surgery; degenerative disc disease of the thoracic and lumbar spine disorder with T11 spinal cord lesion; obesity; Addison's disease/adrenal insufficiency; bipolar 2 disorder; PTSD; and generalized anxiety disorder. AR 2702. The ALJ further found that, although the evidence indicated that physicians had evaluated and treated Samantha S. for aortic valve insufficiency, asthma, migraines, pelvic floor dysfunction, anemia, thoracic astrocytoma, and endometriosis, those conditions were medically managed and controllable. *Id.* Thus, the ALJ classified these impairments as nonsevere. *Id.* Finally, the ALJ acknowledged that the medical records repeatedly mentioned multiple sclerosis, but that this was "not a medically determinable impairment" because "the basis of this diagnoses [sic] is not well explained." AR 2702. At step three, the ALJ determined that Samantha S.'s physical and mental impairments were not "of a

9

severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1." AR 2701–03.

The ALJ therefore proceeded to determine Samantha S.'s residual functional capacity ("RFC"), meaning "her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." AR 2701. After considering the record, the ALJ concluded that Samantha S. had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with some exceptions. AR 2704.[1]

At step four, the ALJ concluded that Samantha S. could not perform any of her past relevant work. AR 2711. The ALJ then proceeded to step five and found that, given Samantha S.'s RFC, age, education, and work experience, a significant number of jobs existed that she could have performed during the relevant time period. AR 2712–14. Thus, the ALJ concluded that Samantha S. was not disabled within the meaning of the Social Security Act from June 27, 2020 through May 29, 2024 and denied her DIB application. AR 2714.

## LEGAL STANDARD

### I. Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] Specifically, the ALJ concluded that Samantha S. could "lift and carry not more than 10 pounds; sit, stand, or walk for six or more hours each of an eight-hour day; occasionally climb ramps and stairs, balance, and stoop; not kneel, crouch, or crawl; not climb ladders, ropes or scaffolds; not work around unprotected heights or unprotected dangerous moving machinery; frequently handle and finger; no concentrated exposure to dusts, fumes, gases, or poor ventilation; and perform simple, routine tasks, involving simple work-related decisions and routine changes." AR 2704.

conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Although the Court reviews the entire record, it does not displace the ALJ's judgment by reweighing facts or making independent credibility determinations. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But the Court may reverse and remand the ALJ's decision if the ALJ committed an error of law or based her decision on serious factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (citation omitted), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citation omitted).

## II.     Disability Standard

To qualify for DIB, a claimant must show that she is disabled, meaning that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). To determine whether a claimant is disabled, the SSA uses a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4); *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the relevant period. *See* 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant's impairments are severe and meet the twelve-

11

month durational requirement. *Id.* §§ 404.1509, 404.1520(a)(4)(ii). At step three, the ALJ

determines whether the claimant's impairment(s) meet or equal an impairment listed in the

Social Security regulations. *Id.* § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App'x 1. If

the claimant's impairment(s) meet or equal a listing and meet the duration requirement, the

claimant is disabled; if not, the analysis continues, and the ALJ assesses the claimant's RFC. 20

C.F.R. § 404.1520(a)(4)(iii), (e). At step four, the ALJ considers the claimant's RFC and

determines whether the claimant can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the

claimant can perform past relevant work, she is not disabled. *Id.* If she cannot, the ALJ

proceeds to step five, where the ALJ determines whether a substantial number of jobs exist that

the claimant can perform given his RFC, age, education, and work experience. *Id.*

§§ 404.1520(a)(4)(v), 404.1560(c). If the claimant can perform other work, she is not disabled;

if she cannot perform other work, she is disabled. *Id.* § 404.1520(a)(4)(v). The claimant bears

the burden of proof at steps one through four, and the burden shifts to the government at step

five. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

### I.      State Psychological Consultants' Medical Opinions

Samantha S. first argues that the ALJ improperly rejected the opinions of two state

psychological consultants, Dr. Howard Tin and Dr. Robert Jackson. Both consultants opined

that Samantha S. has the capacity to perform only one- and two-step tasks. AR 121, 134. The

ALJ rejected these opinions as "not persuasive," explaining that:

> This limitation is not supported by citation to any findings showing
> claimant lacks capacity for mental activities (including work-
> related activities) of more than one or two "steps." Moreover, the
> mental status exams discussed above, the claimant's presentations
> at the various medical exams, their participation in their own

> medical care and ability to make decisions regarding their own
> medical care, as well as the activities in which claimant engaged,
> as described herein, are inconsistent with the conclusion that the
> claimant can only perform tasks with no more than 2 "steps."

AR 2710 (citing AR 103–124, 127–136, 3140, 3166, 3168, 3191, 3224). The ALJ further concluded, based on her own review of the "objective evidence and [Samantha S.'s] own activities," that Samantha S. had "a higher capacity" for "more than reasoning level 1 jobs or work with only one or two-step tasks." AR 2712–13.

Samantha S. argues, and the Court agrees, that the ALJ failed to sufficiently articulate her reasons for rejecting the state psychological consultants' opinions regarding this limitation. While an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," she nonetheless must "consider a variety of factors in assessing opinion evidence, including the supportability and consistency of the opinion, the source's relationship with the claimant, and the source's specialization." *Patrice W. v. Kijakazi*, No. 20 C 02847, 2022 WL 2463557, at *3 (N.D. Ill. July 6, 2022). "Supportability and consistency are the two most important factors," and an ALJ must "explain how [she] considered the supportability and consistency factors . . . in [her] determination or decision." *Id.* (citing 20 C.F.R. § 404.1520c(b)(2)). Supportability "focuses on what the source brought forth to support his or her findings," whereas consistency "compares the source's findings to evidence from other sources." *Annette C. v. O'Malley*, No. 4:23-CV-00094, 2024 WL 4234050, at *4 (S.D. Ind. Sept. 19, 2024). "Failure to consider both supportability and consistency requires remand." *Id.*

Here, the ALJ did not sufficiently explain her analysis of the consistency of the state agency psychologists' opinions. Although the ALJ cursorily stated that the one- and two-step task limitation was inconsistent with certain categories of evidence, it is not clear what specific

evidence she meant. The ALJ referenced, for example, "the activities in which [Samantha S.] engaged, as described herein" and the "mental status exams discussed above" as contradictory evidence, AR 2710, but she did not elaborate on the specifics. Although "a detailed analysis [of the evidence] is not required," the ALJ must provide sufficient detail "to give a reviewing court the bridge to connect the outcome to the record." *Evonne R. v. Kijakazi*, No. 20 CV 7652, 2022 WL 874650, at *5 (N.D. Ill. Mar. 24, 2022). Vague references to evidence detailed elsewhere in the decision fall short of meeting that standard. *Id.* (holding that the ALJ's "reference to 'the physical examination evidence detailed above'" was insufficient to explain why the medical opinion was unsupported or inconsistent with the record); *Rebecca M. B. v. Kijakazi*, No. 22 C 41, 2023 WL 3168894, at *4 (N.D. Ill. Apr. 28, 2023) ("While the Court reads the ALJ's opinion as a whole, and ALJs need only minimally articulate their analysis, it does not mean that ALJs can recite the cold medical record upfront, and then make conclusions without analysis later in the opinion."). Nor did the ALJ explain *why* the broad categories of evidence she identified were inconsistent with a limitation of performing only one- and two-step tasks. Rather than articulate her reasoning, the ALJ merely "identified a conclusion—as opposed to an explanation—with respect to the consistency of the consultants' opinions with the record." *Patrice W.*, 2022 WL 2463557, at *4. "This alone warrants remand." *Id.*; *see also Mueller v. Astrue*, 493 F. App'x 772, 776 (7th Cir. 2012) ("The ALJ's entire 'analysis' of Dr. Wright's assessment consists of a one-sentence declaration that Dr. Wright's opinion is inconsistent with [other evidence]. This is a conclusion, not a reason (or reasons)."); *Hinton v. Colvin*, No. 10 C 2828, 2013 WL 2590711, at *7 (N.D. Ill. June 11, 2013) ("[M]erely reciting the medical evidence in close proximity to conclusions does not create an accurate and logical connection between evidence and conclusions." (citations omitted)).

14

Equally problematic is the ALJ's decision to substitute her own unqualified opinion for the opinions of the state agency psychologists. An ALJ "may not determine the significance of medical findings themselves," and remand is required where an ALJ "(1) creates an 'evidentiary deficit' by rejecting every expert opinion in the record and then (2) fills that deficit with her own interpretation of medical evidence." *Alvin S. v. Kijakazi*, No. 21-CV-3781, 2023 WL 2499860, at \*4 (N.D. Ill. Mar. 14, 2023) (collecting cases). In *Alvin S.*, for example, the court concluded that the ALJ erred when she rejected the state agency psychological consultants' opinions that the claimant "should be restricted to jobs involving only one- to two-step tasks" and instead concluded that the claimant "required no mental RFC accommodations whatsoever." 2023 WL 2499860, at \*4. Even if the ALJ's rejection of those opinions had been reasonable, the court held that the ALJ's conclusion regarding the limitations was improper because the ALJ "relied on her own 'independent deductions'" and "impermissibly 'played doctor.'" *Id.* Numerous other courts have held similarly. *See, e.g.*, *Joel B. v. Kijakazi*, No. 121CV01894, 2022 WL 2589785, at \*6 (S.D. Ind. July 7, 2022) ("Having disregarded PA-C Emmett's and Dr. Harris's opinions, the ALJ was left with an 'evidentiary deficit' that she could not reasonably fill with her lay interpretation of the evidence."); *Phillips v. Berryhill*, No. 17 C 4509, 2018 WL 4404665, at \*4 (N.D. Ill. Sept. 17, 2018) ("Here, the ALJ gave the medical opinions of the state agency medical consultants little weight . . . [and instead] used her own lay opinions to render her RFC assessment. . . . This was improper, and it cannot support the ALJ's RFC determination." (citations omitted)); *Daniels v. Astrue*, 854 F. Supp. 2d 513, 524 (N.D. Ill. 2012) ("Once the ALJ determined that Dr. Robinson's opinions were insufficient and unsupported by the medical evidence, the ALJ had a duty to conduct an appropriate inquiry to fill that gap. What the ALJ could not do was fill in the gap on her own.").

The same is true here.  Having rejected the opinions of the state agency psychologists, the ALJ could not rely on her own independent reasoning to conclude that the "objective evidence and [Samantha S.'s] own activities document" that Samantha S. has "a higher capacity."[2]  AR 2713.  On remand, "if the ALJ again finds that the state agency consultants' opinions are inconsistent with the record—as would be her prerogative under 20 C.F.R. § 404.1520c(a)—she should summon an additional psychological expert to interpret the evidence rather than interpreting it herself."  *Alvin S.*, 2023 WL 2499860, at *4.

While the Commissioner argues that this error was harmless, the Court disagrees.  The limitation imposed by the ALJ to "simple, routine tasks involving simple work-related decisions and routine changes," AR 2710–11, is less restrictive than a limitation to one- to two-step tasks. *Rita R. v. Kijakazi*, No. 21 C 5631, 2023 WL 2403139, at *4 (N.D. Ill. Mar. 8, 2023) ("The ALJ's error is of crucial importance because a limitation to 'simple tasks' (the RFC limitation the ALJ found here) encompasses jobs that may involve complexity beyond one-to-two step tasks."); *Deborah B. v. Kijakazi*, No. 20-CV-7729, 2022 WL 1292249, at *2 (N.D. Ill. Apr. 29, 2022) ("This omission is crucial because the limitation to one-to-two step tasks is more restrictive than just the limitation to simple work found by the ALJ.").  As numerous courts in this circuit have explained, "a limitation to one- to two-step tasks is consistent with GED Reasoning Development Level 1."  *Wiszowaty v. Astrue*, 861 F.Supp.2d 924, 947 (N.D. Ind. 2012) (collecting cases); *see also James T. v. Kijakazi*, No. 20 CV 4990, 2023 WL 8372039, at *4 (N.D. Ill. Dec. 1, 2023) ("Cases from the Northern District of Illinois 'have repeatedly

---

[2] The Commissioner points out that "a third state-agency psychologist, Donna Galassi-Hudspeth, Psy.D., also reviewed plaintiff's records and she did not find that plaintiff was restricted to one and two-step tasks."  Doc. 18 at 8 n.7.  The ALJ did not discuss or rely on Dr. Galassi-Hudspeth's opinions in her opinion, so this does not change the Court's conclusion.

interpreted the restriction [to one-to-two step tasks] to limit a claimant to Level 1 Reasoning jobs,' as defined by the Dictionary of Occupational Titles (DOT)." (collecting cases)).[3]  Yet each of the jobs that the vocational expert testified Samantha S. could perform was Reasoning Level 3.  DOT 249.587-018 Document Preparer, 1991 WL 672349; DOT 237.367-046 Telephone Quotation Clerk, 1991 WL 672194; DOT 205.367-030 Election Clerk, 1991 WL 671719; DOT 209.587-010 Addresser, 1991 WL 671797; *see also* AR 2713 ("I acknowledge these jobs are all reasoning level 3.").  For this reason, the Court cannot conclude that the vocational expert's testimony would have been the same had the ALJ asked about a hypothetical individual limited to one- to two-step tasks.  *See Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) ("An error is harmless if, upon examination of the record, the court can 'predict with great confidence what the result of remand will be.'"); *Eddins v. Colvin*, No. 15 C 8372, 2016 WL 6803102, at *7 (N.D. Ill. Nov. 16, 2016) ("The ALJ's error here was not harmless.  The ALJ did not ask the VE about a hypothetical individual limited to one-to-two step tasks, and the VE's opinion as to which jobs would be available to a person who could perform simple, routine, repetitive tasks was not limited to jobs containing only one-to-two steps tasks.").

## II.    Dr. Fontes's Medical Opinions

Samantha S. also argues that the ALJ erred in determining that the opinions of Dr. Fontes regarding Samantha S.'s physical limitations were not persuasive.  Dr. Fontes opined, among other things, that Samantha S. was able to stand and walk for less than two hours in an eight-hour

---

[3] The Commissioner cites to a single, non-binding case that held otherwise.  In *Antonio D. v. Kijakazi*, the court concluded that jobs with Reasoning Level 2 were not necessarily "beyond what the reviewers considered to be one- to two-step tasks."  No. 21 C 4104, 2022 WL 4182392, at *7 (N.D. Ill. Sept. 13, 2022)).  The Court does not find the reasoning of *Antonio D.* persuasive and instead chooses to follow the majority of courts in this circuit holding that a limitation to one- to two-step tasks limits a claimant to Reasoning Level 1 jobs.

17

working day and could not perform any "fine manipulations" with her fingers.  AR 3419, 5711–13.  The ALJ concluded that Dr. Fontes' opinions were not persuasive due to certain "internal discrepancies" within his opinions and inconsistencies with the record.  AR 2709.  The Court again finds that the ALJ failed to sufficiently articulate her reasons for rejecting Dr. Fontes' opinions, warranting remand.  *See Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017) ("An inadequate evaluation of a treating physician's opinion requires remand.").

The same standard applies to the ALJ's review of Dr. Fontes' opinion as the state psychological consultants' opinions, meaning that the ALJ ""will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" but "instead must consider the persuasiveness of medical opinions based on their supportability, consistency, the source's relationship with the claimant (including the length, purpose, and extent of the treatment relationship and the frequency of examinations), specialization, and other factors that would tend to support or contradict a medical opinion." *Patrice W.*, 2022 WL 2463557, at *3; 20 C.F.R. § 404.1520c(a).  And the ALJ's analysis of Dr. Fontes' opinions is insufficient for many of the same reasons as her analysis of the state psychological consultants' opinions.

First, as with the state psychological consultants' opinions, the ALJ did not adequately articulate her reasoning with respect to the supposed inconsistencies in Dr. Fontes' report.  For example, the ALJ highlighted that "[a]lthough Dr. Fontes noted rigid gait and decreased fine motor dexterity in his progress notes, he also observed independent gait and normal lower extremity strength" elsewhere.  AR 2709.  But the ALJ included no explanation as to how these observations are necessarily inconsistent, leaving the Court scratching its head.  It seems entirely feasible that Samantha S. could have normal lower extremity strength and decreased fine motor dexterity at the same time, and the Court fails to see how Samantha S.'s ability to walk

18

independently means that she cannot also have a rigid gait. The ALJ also emphasized that "Dr. Fontes insinuated that the claimant's high narcotics dose impaired her thinking and attention, but Dr. Fontes and other physicians repeatedly recommended that the claimant wean off narcotics." AR 2709. Again, the Court fails to see any inconsistency in this evidence; to the contrary, it makes perfect sense that a physician would recommend that their patient wean off medication with side effects such as impaired thinking and attention. Without an explanation as to why this evidence is necessarily inconsistent, the ALJ again provided simply a conclusion and failed to adequately articulate her reasoning. *See Mueller*, 493 F. App'x at 776 ("The ALJ's entire 'analysis' of Dr. Wright's assessment consists of a one-sentence declaration that Dr. Wright's opinion is inconsistent with [other evidence]. This is a conclusion, not a reason (or reasons)."); *Hinton*, 2013 WL 2590711, at *7 ("[M]erely reciting the medical evidence in close proximity to conclusions does not create an accurate and logical connection between evidence and conclusions." (citations omitted)).

Moreover, the ALJ seemingly did not stop to consider that some of the supposed discrepancies in Dr. Fontes' statements may simply be because symptoms and medical needs change over time. For example, the ALJ noted that Dr. Fontes' July 2023 statement asserted that Samantha S. walked with an assistive device, whereas his March 2024 statement omitted this limitation. But the evidence indicates that Samantha S. did not consistently use a walker and instead used the walker only when recovering from surgery or when she felt particularly dizzy or tired. *See* AR 258 (reporting that Samantha S. used a walker "in the hospital, after surgery" and when she felt dizzy or tired while walking); AR 274 (same); AR 2656 ("[Samantha S.] used a walker at home for a month after the most recent fusion due to weakness."). Indeed, the ALJ herself recognized elsewhere that Samantha S.'s use of a walker was temporary in nature. *See*

19

AR 2708 ("After spine surgery in July 2022, the claimant was advised to wear a back brace, use a rolling walker, and avoid overhead reaching. These recommendations are supported for only a brief time[.]" (citation omitted)). Given the ALJ's own recognition of these changed circumstances, the Court cannot fathom why the ALJ would discredit Dr. Fontes' opinions on these same grounds.

The ALJ's discounting of Dr. Fontes' evaluation of Samantha S.'s "extensive limitations" amounts to a material error requiring remand, as the Court cannot conclude that the vocational expert's testimony would have been the same had the ALJ asked about a hypothetical individual with these limitations. *See Wilder*, 22 F.4th at 654.[4]

## CONCLUSION

For the foregoing reasons, the Court denies the Commissioner's motion for summary judgment [18]. The Court reverses the ALJ's decision and remands this case to the Social Security Administration for further proceedings consistent with this Opinion.

Dated: July 21, 2026

SARA L. ELLIS
United States District Judge

___

[4] Because the Court has concluded that a remand is required, it need not address Samantha S.'s other arguments at this time.